IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALEXANDER WILSON,

      Plaintiff,

vs.                                        Civ. No. 99-759 JP/WWD

PITRE, INC.,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

On December 11, 2000, the Defendant filed a Motion for Summary Judgment (Doc. No. 22). After a careful review of the briefs and the relevant law, I have determined that Defendant's motion for summary judgment should be granted in part.

I.  Background

The Defendant employed the Plaintiff as a car salesman for approximately four years until November 26, 1997.  The Plaintiff alleges that during his last year of employment with the Defendant the desk managers, comptroller, and General Manager subjected the Plaintiff to derogatory racial slurs and comments regarding the fact that the Plaintiff is Navajo.  These remarks were also allegedly directed towards Native American customers.  On September 26, 1997, the Plaintiff submitted a Charge of Discrimination to the Equal Employment Opportunity Commission (EEOC) based on the racial slurs and comments.  The Plaintiff alleges that after he filed the Charge of Discrimination, the Defendant disciplined him for lack of production for the first time, supervisors called him names like "Judas backstabbing Indian," and ultimately, the Defendant indefinitely suspended him on November 26, 1997.  The Plaintiff contends that the suspension was an effective termination.

The Plaintiff's Complaint alleges racial discrimination and retaliation under both Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act. The Plaintiff also alleges a claim for intentional infliction of emotional distress. The Defendant filed a counterclaim alleging that the Plaintiff owes it $5,939.00 for loans, cash advances, and debits made to the Plaintiff's personal account with the Defendant. The Defendant moves for summary judgment on all of the Plaintiff's claims and seeks recovery on its counterclaim.

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

III.  Discussion

    A.  Racial Discrimination[1]

    The Plaintiff bases his racial discrimination claim on an allegation of a hostile work environment.  In order to prevail on this claim, the Plaintiff must establish that under the totality of the circumstances: "'(1)  the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.'"  *See Trujillo v. Univ. of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)).  This hostile work environment test requires that a plaintiff only show that the alleged harassment was either pervasive or severe.  *Smith v. Norwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997).  "To fulfill his burden under the pervasiveness standard, the 'plaintiff must show more than a few isolated incidents of racial enmity.'  'Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'"  *Witt v. Roadway Exp.*, 136 F.3d 1424, 1432 (10th Cir.), *cert. denied*, 525 U.S. 881 (1998)(citations omitted).

    Tom Stever, Defendant's comptroller, stated in an affidavit that on September 8, 1997, the Plaintiff told him that for six months he had been recording derogatory comments made by Defendant's employees regarding Native Americans.  Exhibit A at ¶6 (attached to Defendant Pitre, Inc.'s Memorandum in Support of Motion for Summary Judgment (Defendant's Memo) (Doc. No. 23), filed Dec. 11, 2000).  The Plaintiff testified in his deposition that beginning in

---

[1]Because it is appropriate to rely on federal civil rights adjudication for guidance in analyzing a claim under the New Mexico Human Rights Act, I will treat the Plaintiff's state racial discrimination and retaliation claims in tandem with the federal claims.  *See Gonzales v. New Mexico Dept. of Health*, 2000-NMSC-029 ¶20, 11 P.3d 550.

January 1996 Charles Fiorenza and Rob Hoosier (both desk managers) made off-color comments about Native American customers at the desk where deals are handled (the Tower).  Exhibit B at 17 (attached to Defendant's Memo).  Moreover, according to the Plaintiff, on several occasions through 1997, when desk managers were reviewing Plaintiff's deals from Native American customers, the desk managers would make insulting remarks about the customers referring to them as Indian deadbeats or words to that effect, and would throw the deal papers in the air so that the Plaintiff had to pick up the papers.  *Id.* at 20-21.  The Plaintiff also testified at his deposition that around January 1996, Mr. Fiorenza called him "an ugly Indian."  *Id*. at 17-19. The Plaintiff further testified that all of the desk managers commented that he had sexual relationships with sheep, derogatory comments based on the fact that Navajos raise sheep on the reservation. *Id*. at 29, 31.  After the Plaintiff filed his Charge of Discrimination, Mr. Fiorenza would make a "baa" sound when passing the Plaintiff.  *Id*. 35.  Moreover, the Plaintiff was called a "Judas backstabbing Indian."  *Id*. at 28.  Another incident described by the Plaintiff involved two desk managers who made a sexual comment regarding Native American art and its depiction of women and corn, a sacred plant.  *Id*. at 37.  The Plaintiff also testified that one other time, a couple of desk managers and a salesman were watching a pornographic video at the tower and remarked to the Plaintiff that the movie did not have sheep in it.  *Id*. at 41.  Moreover, Charles Ratliff made a joke about "stinkin' Indians."  *Id.* at 46.  The Plaintiff testified that at another time, he was going to deliver a car in Gallup and someone made another crude remark about the Plaintiff and sheep. Exhibit D at 72 (attached to Response in Opposition to Defendant Pitre, Inc.'s Motion for Summary Judgment (Plaintiff's Response) (Doc. No. 24), filed Dec. 11, 2000).

Mr. Hooser admitted in his affidavit that "kidding and joking can sometimes become somewhat crude, with sexual and racial overtones to it."  Exhibit C at ¶3 (attached to Defendant's Memo).  Dale Rice, a salesman, stated in an affidavit that he heard the references to the Plaintiff's sexual relationship with sheep and Native Americans being referred to as "dead beats."  Exhibit E (attached to Defendant's Memo).  Mr. Stever also admitted that Mr. Hooser, Mr. Fiorenza, Mr. DeMarco (Defendant's general manager), Mr. Ratliff, and he, personally, made sexual comments about the Plaintiff and sheep. Exhibit E (attached to Plaintiff's Response). Mr. Stever further noted that he made a sexual comment regarding "gay Indians" and goats.  Exhibit E (attached to Plaintiff's Response).  *Id*.

Viewing the evidence in the light most favorable to the Plaintiff, I find that there is sufficient evidence for a reasonable jury to conclude that the Plaintiff was subjected to more than just a few isolated racial slurs and that there was a pervasive environment of racial harassment towards Native Americans.  Having made this finding, there is no need to analyze whether the harassment was severe.  Consequently, the Plaintiff has shown that there is a genuine issue of fact with respect to the hostile work environment claim.  Summary judgment is, therefore, not appropriate on the hostile work environment claim.

B.  Retaliation

The three-pronged burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to the Plaintiff's retaliation claim. In the absence of direct evidence, a *prima facie* case of retaliation requires a plaintiff to show that: (1) he engaged in protected opposition to discrimination; (2) he was subjected to adverse employment action by the employer; and (3) a causal connection exists between the protected activity and the adverse

action. *See McCue v. State of Kansas, Dept. of Human Resources*, 165 F.3d 784, 789 (10th Cir. 1999).  "If a *prima facie* case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action."  *Purrington v. Univ. of Utah*, 996 F.2d 1025,1033 (10th Cir. 1993). If the employer offers such a reason, the plaintiff may survive summary judgment by showing that there is a genuine dispute of material fact as to whether the proffered reason for the challenged action is pretextual. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir. 1997).

By filing the EEOC Charge of Discrimination, the Plaintiff engaged in a protected activity. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). The next question is whether the Defendant subjected the Plaintiff to an adverse employment action. The Tenth Circuit liberally construes the concept of "adverse employment action."  *Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998).  As there is no set test to determine what constitutes an "adverse employment action,"each case must be evaluated on its own unique circumstances. *Id*. The claimed adverse actions in this case include two Employee Warning Reports and the Plaintiff's suspension from work.  I find these actions constitute adverse employment actions.

The Plaintiff must next show that there is a causal connection between the adverse employment actions and the alleged racial harassment.  The closer the adverse action occurred to the protected activity, the more likely it will support a showing of causation. *See Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997).  The Employee Warning Reports were made just over a month after the Plaintiff filed his EEOC Charge of Discrimination.  The proximity of these Employee Warning Reports to the filing of the Charge of  Discrimination is sufficient to establish a causal connection.  *See Ramirez v. Oklahoma*

6

*Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation). While the suspension occurred two months after the filing of the EEOC Charge of Discrimination, the proximity of this adverse employment action to the filing of the Charge of Discrimination is likewise sufficient to show a causal connection. *See Amir v. St. Louis*, 184 F.3d 1017, 1024-25 (8th Cir. 1999)(dismissal occurring just over two months after filing of lawsuit provides causal connection between the protected activity and the adverse action); *Rivera v. Levitt*, 88 F.Supp.2d 1132, 1145-46 (D. Colo. 2000)(two months is "close enough temporal proximity to support inference of causation."). I, therefore, find that a reasonable jury could conclude that the Plaintiff established a *prima facie* case of racial discrimination.

The Defendant argues, however, that the Employee Warning Reports were justified on nonracial grounds. The first Employee Warning Report, dated October 30, 1997, states that the Plaintiff called the Defendant to notify the Defendant that he would be late to work on October 27, 1997 because of personal business. Exhibit B-2 (attached to Defendant Pitre, Inc.'s Reply to Plaintiff's Response in Opposition to Pitre, Inc.'s Motion for Summary Judgment (Defendant's Reply) (Doc. No. 25), filed Dec. 11, 2000). According to the Employee Warning Report, the Plaintiff did not come to work at all on October 27, 1997. *Id.* The Plaintiff responded to the Employee Warning Report by stating he did not go to work because he had only an hour and a half of work time left that day. *Id.* Mr. Stever states in an affidavit that he personally saw the Plaintiff at a bar during work hours on October 27, 1997. Exhibit B at ¶3 (attached to Defendant's Reply). The Plaintiff had previously been reported on December 2, 1996 for not calling the Defendant when he was going to be late or not at work. Exhibit B-1 (attached to

Defendant's Reply).  Since the Plaintiff admits that he failed to report to work despite saying he would and has a previous history of not calling to work when he will be absent, I find that a reasonable jury could find that the Defendant had a legitimate nondiscriminatory reason for writing the October 30, 1997 Employee Warning Report.

The second Employee Warning Report, dated November 3, 1997, states that the Plaintiff had been previously warned that he must sell at least six vehicles a month but he did not do so. Exhibit B-2 (attached to Defendant's Reply).  The Plaintiff responded to the Employee Warning Report by noting that due to problems at work he could not fully perform his job but since those problems were being resolved he would do better in November 1997.  *Id*.  This October 1997 incidence of low productivity, however, is not the first time the Plaintiff has been reported for lack of sales.  The Defendant wrote an Employee Warning Report for lack of sales on August 1, 1996, December 2, 1996, and October 2, 1997 (for the month of September 1997).  Exhibit B-1 (attached to Defendant's Reply).  Considering the Plaintiff's history of poor work performance, I find that a reasonable jury could find that the Defendant had a legitimate nondiscriminatory reason for writing the November 3, 1997 Employee Warning Report.

The facts surrounding the Plaintiff's November 26, 1997 suspension are not entirely clear. Orlinda Brown purchased two vehicles from the Plaintiff, one of which was for Ms. Brown's sister, Juanita.  Juanita apparently did not have a good credit history and could not buy the car herself but promised her sister to make the car payments.  Juanita was unable to make the car payments, so Ms. Brown called the Plaintiff stating she wanted to return the car so her credit history would not be damaged.  According to the Plaintiff, Ms. Brown left the keys to the car at the Defendant's finance office and someone placed the keys on the Plaintiff's desk.  Exhibit D at

74 (attached to Plaintiff's Response).  A couple of hours later, the Plaintiff spoke with Ms. Brown and she explained why she left the car.  *Id*. at 74-75.  The Plaintiff, on his own, proceeded to arrange for Wanda Yazzie to take the car and resume payments on it.  *Id*. at 76.  The Plaintiff testified at his deposition that a person named John, Ms.Yazzie's friend, retrieved the car.  *Id*. at 77.

On November 26, 1997, Mr. Stever, Clark Wiggins (the General Manager at that time), Mr. Fiorenza, Mr. Hooser, and T. J. Smith met with the Plaintiff regarding the return of Ms. Brown's car.  Mr. Stever states that the Plaintiff admitted to taking the car and promised to return it.  Exhibit E (attached to Plaintiff's Response).  According to Mr. Stever and Mr. Fiorenza, they and several other of Defendant's employees saw the Plaintiff driving that car.  *Id*.; Exhibit F at 35 (attached to Plaintiff's Response).  There is conflicting evidence from the Defendant's employees as to whether the car was ever returned to the dealership and as to when they began investigating this incident.

It is undisputed that the Defendant suspended the Plaintiff because he made what is known as a "straw purchase."  The Plaintiff admits to the "straw purchase" but also contends that the Defendant approved the "straw purchase."  However, according to his version of the facts, the Plaintiff did not inform either the Defendant or the financing company about Ms. Brown's request to return her sister's car or what became of the car after Ms. Brown returned it to the Plaintiff.[2]

---

[2]The Plaintiff claims that the Defendant did not let him explain what happened to the car by not accepting his telephone call a few days after the suspension.  Exhibit D at 80 (attached to Plaintiff's Response).  The Plaintiff, nonetheless, did not pursue further communication with the Defendant by additional telephone calls, an in-person visit, or writing a letter of explanation. Instead, the Plaintiff apparently began a new job as a car salesman at Quality Pontiac-GM Buick (Quality) a few days after the Defendant suspended him.

Considering the Plaintiff's suspicious actions with respect to this incident, I find that a reasonable jury could conclude that the Defendant had a legitimate, nondiscriminatory reason for suspending the Plaintiff. The Plaintiff has failed to present evidence showing that there is a genuine dispute of material fact as to whether the Defendant's proffered reasons for the Employee Warning Reports and suspension were pretextual. Accordingly, I find that summary judgment is appropriate on the retaliation claim.

C.  Intentional Infliction of Emotional Distress

New Mexico law applies to the supplemental claim of intentional infliction of emotional distress. *See BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089,1103 (10th Cir. 1999). Under New Mexico law, I must initially determine "as a matter of law whether conduct reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress." *Padwa v. Hadley*, 1999 NMCA-067 ¶9, 127 N.M. 416. "When reasonable persons may differ on that question, it is for the jury to decide...." *Id.* Generally, in order to qualify under this standard, the recitation of the underlying facts to an average member of the community must arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Id.* at ¶10 (quoting *Restatement (Second) of Torts* § 46 cmt.d. (1965)). Moreover, the conduct must cause severe emotional distress. *Id.* (quoting *Restatement (Second) of Torts* § 46(1)).

Without deciding whether the Defendant's employees' racial slurs and comments were extreme and outrageous, I conclude that reasonable persons would not differ in finding that the Plaintiff did not suffer severe emotional distress as a result of the Defendant's employees' conduct. The Plaintiff claims that he had to end his employment at Quality due to severe stress,

10

chest pains, and headaches.  Exhibit B at 84, 88 (attached to Defendant's Memo).  Plaintiff's

doctor stated only that the Plaintiff should relax and watch his diet.  *Id*. at 85.  In fact, the Plaintiff

conceded that "it was really nothing serious, unless I was driving, so I just relaxed."  *Id*.  The

Plaintiff also does not take any narcotic drugs for pain.  *Id*. at 88.  Under these circumstances, I

find as a matter of law that summary judgment should be granted on the intentional infliction of

emotional distress claim.

     D.  The Counterclaim

     The Plaintiff does not dispute that he owes the Defendant $5,939.00.  Consequently,

summary judgment will granted on the counterclaim.

     IT IS ORDERED that Motion for Summary Judgment (Doc. No. 22) is:

     1. Denied as to Plaintiff's racial hostile work environment claim;

     2. Granted as to Plaintiff's retaliation and intentional infliction of emotional distress claims

which will be dismissed with prejudice; and

     3. Granted as to Defendant's counterclaim.


                  _____

                  CHIEF UNITED STATES DISTRICT JUDGE