IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALEXANDER WILSON,

    Plaintiff,

vs.

                        No. CIV-99-759 JP/WD

PITRE, INC.,

    Defendant.

## DEFENDANT PITRE INC.'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Pitre, Inc., through its undersigned counsel, Kelly, Rammelkamp & Muehlenweg, P.A., submits the following proposed Findings of Fact and Conclusions of Law.

### BACKGROUND

On January 11, 2001, this Court entered its Memorandum Opinion and Order Granting Summary Judgment for Defendant [Doc. No. 26] dismissing Plaintiff's retaliation and intentional infliction of emotional distress claims. The only claim tried to the Court was Plaintiff's hostile work environment claim.

### FINDINGS OF FACT

1.    Pitre, Inc. ("Pitre") is a New Mexico corporation engaged in the business of automobile sales and service with a dealership on Albuquerque's West Side.

2.    At all times relevant hereto, Pitre was an employer engaged in an industry affecting commerce within the meaning of Section 701(b),(g) and (h) of Title VII, 42 U.S.C. §2000 e-(b),(g) and (h).

3.    At all times relevant hereto, Pitre employed between fifteen (15) and one hundred (100) employees.



4. Plaintiff is an individual residing in Bernalillo County and was hired as a car salesman for Pitre in June of 1994 and remained in this position until November 26, 1997.

5. Bob Pitre, Thomas D. Stever ("Stever"), Charles A. Fiorenza ("Fiorenza"), Anthony DeMarco ("DeMarco") and Rob L. Hooser ("Hooser") were all employed by Pitre and were, at all times relevant hereto, in supervising positions to Plaintiff.

6. Plaintiff had a reputation among his co-workers of being a practical joker, often engaging in crude joking and off-color comments. In fact, the nature of automobile sales is generally such that the salespeople within a dealership spend a great deal of idle time together on a daily basis and become very familiar with one another and rough joking in such an environment is not uncommon. However, several of Plaintiff's co-workers agreed that Plaintiff was more often than not the initiator of some of the more vulgar joking that took place.

7. For example, prior to working at Pitre, Plaintiff was employed at Ed Black's Chevrolet. When he worked at Ed Black's Chevrolet, Plaintiff was known to tape signs to the demonstrator vehicles of other salesmen containing the words "Honk…I'm Gay" or similar statements. Plaintiff would tape the signs under the vehicles in such a manner that they would not be noticeable to the other employees, but would flap down and become visible when the employee drove the vehicle. On one occasion while he worked at Ed Black's Chevrolet, Plaintiff taped a soiled diaper under the desk of another salesmen. Plaintiff was also known to exchange the nameplate from a fellow employee's office with

that of the men's restroom. Plaintiff never expressed any offense at such conduct but rather, as stated, was an active participant.

8. When he became an employee at Pitre, Plaintiff continued to be an active participant in the give-and-take rough humor which can sometimes take place in the work environment of an automobile dealership. For example, Fiorenza, who considered himself a "close friend" of Plaintiff due to their long working relationship together, testified that the Plaintiff referred to him as "dumb dago" and as "white man." Fiorenza stated that when Plaintiff presented car deals to his supervisors, he would refer to the supervisors as "white men with little penises who fuck cows." According to Fiorenza, Plaintiff was not offended by the comments, but rather laughed and gestured as he made the comments. Hooser, another of Plaintiff's supervisors, testified that Plaintiff frequently commented to him, "You white guys all have little dicks."

9. Plaintiff also made lewd drawings and shared them with his co-workers and supervisors. Plaintiff's drawings included depictions of nude women and of Plaintiff's supervisors in sexual positions with animals. On one occasion, Plaintiff brought a drawing to the sales desk which depicted three of his supervisors having sex with sheep. As he showed it to his supervisors, Plaintiff laughed and said, "I hear you guys do sheep."

10. Several other salespeople who worked with Plaintiff at Pitre also witnessed Plaintiff's initiation and participation in the off-color joking at the dealership:

    a. Dale L. Rice ("Rice"), a salesman at Pitre, testified that Plaintiff brought on the joking by talking about "yahoos". According to Rice, other employees would chime in when Plaintiff would use this term. Rice stated that

Plaintiff referred to people as "white men" and commented that the white man had tortured the Indian. According to Rice, this type of kidding went back and forth between Plaintiff and others and Plaintiff never seemed offended by the remarks.

        b.     R.C. Bayer ("Bayer"), another Pitre salesman, testified that Plaintiff originated the term "yahoo" to refer to Native Americans. Bayer admitted that there is kidding around at work and recalls that Plaintiff kidded around a lot. Bayer recalled that Plaintiff liked to rub Bayer's stomach and say that he was having a baby. Bayer indicated that the kidding was not directed at anyone's race or beliefs.

        11.     The joking at the dealership extended to others at the dealership; Plaintiff and Native Americans were not singled out.

        12.     Despite his active participation in the joking, Plaintiff claims that he began to be offended by the joking at the dealership sometime in 1996 or 1997.

        13.     Plaintiff testified that even after he began to be offended, he continued to use the term "yahoo" when bringing deals involving Native Americans to the sales desk to signify to the sales managers that the customer was Native American.

        14.     Plaintiff testified that whenever statements which he construed as offensive were made, he would simply walk away from it and it would end.

        15.     Plaintiff testified that DeMarco never made any offensive comments which he felt were directed at him.

        16.     Plaintiff testified that Bob Pitre, the owner of the dealership, never did or said anything that Plaintiff felt was offensive. See Plaintiff's Deposition 53:14-17.

17. At some point during 1997, Plaintiff had contact with Conroy Chino ("Chino"), a local television news investigative reporter. Plaintiff claims that Chino set him up with a recording device which allowed Plaintiff to record the alleged harassing statements being made at the dealership. The Plaintiff claims he had a microphone on his tie and a recording device in his pocket and that he would record conversations as they were occurring at the dealership.

18. Despite requests by the Equal Employment Opportunity Commission ("EEOC") and discovery requests made as a part of these proceedings, the tape recordings which Plaintiff alleges were made have never been produced and Plaintiff has agreed that none will be produced as a part of this trial.

19. At some point in the fall of 1997, word got out at the dealership that Plaintiff was wearing a wire. When Plaintiff's supervisors learned of this rumor, they stopped any and all manner of joking with Plaintiff. Nevertheless, Plaintiff continued to approach his supervisors at the sales desk with off-color comments and joking in what seemed to be an attempt to solicit similar joking in response.

20. From the time he was hired in June of 1994, through September 7, 1997, Plaintiff never expressed to any supervisory or management level employee of Pitre that he was in any way offended by any language or behavior that was taking place at the dealership.

21. Plaintiff's first report to management of being offended at the joking at the dealership was on September 8, 1997. On this date, Plaintiff advised Stever that

derogatory comments had been made, that he was recording them and the he was planning to turn the tapes over to Chino.

22. Pitre, taking Plaintiff's report of harassment seriously, immediately reported the matter to Bill Flock ("Flock"), the president and CEO of AutoHR, a human resources service which provides human resources and employee relations consulting to Pitre.

23. Flock advised Pitre that Plaintiff's allegations were in the nature of a complaint that a hostile work environment existed at Pitre. Flock reminded Pitre that it already had in place an anti-harassment policy directed toward hostile working environments. Pitre also has an equal employment opportunity policy which specifically forbids discrimination on the basis of national origin or race. Flock advised Pitre that it should reemphasize those policies to its employees and leave no doubt that management would strictly enforce them. It was decided to achieve this through a series of workshops to be presented by Flock on Pitre's behalf entitled "Valuing Diversity."

24. Flock conducted these workshops on September 16, 1997. There was a workshop in the morning for managers and there were three more in the afternoon for all of Pitre's other employees.

25. Flock taught the employees that each of them has the obligation to respect others' beliefs, to treat others as they would want to be treated, and to "reach out" to build relationships with those who are "different" than they. With regard to forbidden conduct, Flock taught the employees that they must not use racial slurs or engage in harassment of any sort.

26. On the Saturday before Flock's workshops, DeMarco, Pitre's general manager, also conducted a meeting with his employees. He specifically reemphasized that company policy forbids the use of racial slurs, derogatory comments, or anything that could lead to the creation of a hostile working environment.

27. Under the totality of the circumstances, the alleged harassment in this case was not so severe or pervasive as to alter the terms, conditions or privilege of employment.

28. Under the totality of the circumstances, the alleged harassment was not directed at Plaintiff's race or nor did it stem from racial animus. Rather, the evidence establishes that the Plaintiff was an active participant in the off-color joking at Pitre and it cannot reasonably be found that he perceived the same as creating a hostile environment. In fact, Plaintiff's compensation while employed at Pitre was commission-based and increased every year of his employment, even during the last year when he alleges that he was being subjected to harassing comments.

29. In January of 1996, Pitre distributed to its employees an Employee Handbook (the "Handbook"). All employees were given a copy of the Handbook. The Handbook was updated in October of 1996 at which time all employees were again given copies. The Plaintiff was employed by Pitre both in January of 1996 and in October of 1996 when the Handbooks were distributed.

30. Both versions of the Handbook contain a written policy against harassment. The policy provides alternative methods for employees to report alleged harassing behavior, including confidential reports to an "800" number hotline:

**Reporting**

> Any incidents of harassment must be immediately reported to your immediate supervisor or other management representative. If you do not feel comfortable talking with that person, you should talk with the President. If you are uncertain about whom to talk to, or feel uncomfortable talking to a Company representative, call **AutoHR Human Resource Service,** using the Employee Hot Line at 1-800-435-5858.

31. The AutoHR Employee Hotline referenced in the Handbook was also prominently posted on the company bulletin board where employees would see it every day, along with federally mandated equal employment opportunity posters addressing race discrimination and harassment.

32. Plaintiff never called the AutoHR Employee Hotline.

33. Upon receiving Plaintiff's report on September 8, 1997, Pitre responded immediately and effectively in conducting the anti-harassment training seminars with AutoHR. In two separate conversations with Stever and Bob Pitre following the training seminars, Plaintiff expressed his gratitude for Pitre's prompt response to his complaints and assured Pitre that he would take no further action against the dealership.

34. Plaintiff's compensation while employed at Pitre was commission-based. Form W-2 records for Plaintiff show the following gross income figures for the term of Plaintiff's employment:

| | |
|---|---|
| 1994 | $4,900 (employment began in June) |
| 1995 | $9,484.64 |
| 1996 | $16,898.57 |
| 1997 | $19,794.06 (employment ended 11/26/97) |

35. Plaintiff was suspended from his position with Pitre on November 26, 1997 for taking custody and control of a vehicle which had been purchased by a customer and in which a third party lender had a security interest.

36. Plaintiff's suspension was based upon legitimate, non-discriminatory reasons.

37. Specifically, during the week of Thanksgiving, Pitre received a telephone call from WFS, an independent company through whom many of Pitre's car sales are financed. WFS informed Pitre that one of its customers, Orlinda Brown, had become delinquent on the payments on her vehicle loan. When WFS inquired of Ms. Brown, she reported that when she could no longer afford the payments for the vehicle, she returned the vehicle to Pitre where she had purchased it. Specifically, she gave the car to Plaintiff. Plaintiff did not report this to Pitre management. Instead, Plaintiff apparently allowed a third party to take possession of the vehicle without the consent or knowledge of Pitre, Ms. Brown or WFS. On the Wednesday before Thanksgiving, Pitre management learned of these allegations and questioned Plaintiff about the car. Plaintiff admitted that he took the car and promised to return it. Plaintiff was suspended until further investigation into the matter had been completed.

38. When the car was not immediately returned as promised by Plaintiff, and in an attempt to obtain more information from Plaintiff about the incident involving Ms. Brown's vehicle, Pitre made a number of attempts to contact Plaintiff, but his home telephone number had been disconnected. Pitre learned that Plaintiff had taken a job as a salesman with Quality Pontiac-GMC-Buick ("Quality"). Pitre telephoned Quality on

December 4, 5 and 8, 1997, leaving voicemail messages for Plaintiff. Plaintiff did not return the calls. In a further effort to contact Plaintiff, Pitre contacted Quality's general manager, David Boyter ("Boyter"), and left a message that it was trying to contact Plaintiff. Boyter returned Pitre's call and indicated that he had passed the message on to Plaintiff. Plaintiff never returned the calls. Since Plaintiff was clearly now employed by another dealership, Pitre took his actions to signify that he had resigned and sent him a letter advising him of the same.

39. Plaintiff was hired as a car salesman at Quality beginning on December 2, 1997, just one week after his resignation from Pitre.

40. Plaintiff was fired from Quality on February 24, 1998 for poor performance. Plaintiff became self-employed as an artist after being terminated from Quality and provided no proof of his income during this period.

41. Plaintiff was employed at Reliable Chevrolet Nissan ("Reliable") from June 10, 2000 until on or about September 30, 2000 as a commissioned automobile sales person. Plaintiff's departure from Reliable was characterized by Reliable as job abandonment as Plaintiff repeatedly failed to come to work for his assigned shifts. Plaintiff earned $8,361.71 during his employment at Reliable.

42. The Plaintiff provided no evidence of emotional distress in this case and no corroborating medical evidence or testimony. Plaintiff's doctor stated only that the Plaintiff should relax and watch his diet. In fact, the Plaintiff conceded that "it was really nothing serious, unless I was driving, so I just relaxed." See Plaintiff's Depo., 85:7-13, 21-22. The Plaintiff also does not take any narcotic drugs for pain.

43. Several of Plaintiff's co-workers at Pitre testified that they were approached by Plaintiff and promised money in exchange for testimony favorable to Plaintiff in this action.

## CONCLUSIONS OF LAW

1. Jurisdiction is proper under 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

2. In determining whether a violation of the New Mexico Human Rights Act ("HRA") has occurred, it is appropriate to look to the evidentiary methodology adopted by the federal courts in their interpretation of federal civil rights laws. See Gonzales v. New Mexico Dept. of Health, 2000-NMSC-029, 11 P.3d 550 (S.Ct. 2000).

3. To succeed on a hostile environment claim, Plaintiff must establish that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions or privilege of employment, and (2) the harassment was racial or stemmed from racial animus... there must be a steady barrage of opprobrious racial comments." See Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (citation omitted). The utterance of a statement which merely "engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." See Gross v. Burggraf Constr., Co., 53 F.3d 1531, 1537 (10th Cir. 1995) (internal quotation marks and citations omitted) (alteration in original). In deciding whether a hostile environment exists, the trier of fact must examine all the circumstances including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with [the Plaintiff's] work performance." See id. at 23; see also Lockard v. Pizza Hut, Inc., 162 F.3d 1062 (10th Cir. 1998). The victim of the harassment need not have suffered psychological harm, though that is a factor that can be considered. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L.Ed.2d 295, 114 S.Ct. 367 (1993). Rather, it must be proven that the environment would reasonably be perceived and is perceived by the plaintiff as hostile or abusive. See id., (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 91 L.Ed.2d 49, 106 S. Ct. 2399 (1986)). In other words, the plaintiff must prove that the work environment was both objectively and subjectively hostile. See Davis v. U.S. Postal Service, 142 F.3d 1334, 1341 (10th Cir. 1998) (citing Smith v. Norwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997)).

    4.    It is important when looking at conduct in a given case, to recognize the context in which the statements were made. See Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1414 (10th Cir. 1997) (emphasizing use of a broad contextual analysis). See also Gross v. Burggraf Construction Co., 53 F.3d 1531, 1539 (10th Cir. 1995) (acknowledging that speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments).

    5.    The alleged offending statements in this case were made in the context of crude joking in which Plaintiff was an active participant. It can not be overlooked in this case that the alleged statements were made in the environment of a car dealership where salespeople spend longs hours and extensive periods of idle time together. In such an environment, the employees become very familiar with one another and humor and

language which can be "rough hewn and vulgar" is commonplace. As the Tenth Circuit recognized in Gross, work environments must be considered in making a determination whether a hostile environment exists as Title VII was not meant to "bring about a magical transformation in the social mores of American workers." See Gross at 1538.

6. The finder of fact must also consider whether the alleged offending statements were directed at Plaintiff or were simply overheard by him. Statements which are merely overheard attenuate the degree of animosity and severity of the harassment as alleged. See e.g. Witt v. Roadway Express, 136 F.3d 1424, 1433 (10th Cir. 1998) (The fact that remarks are overheard or not directed at the employee/plaintiff "indicated a lower degree of animosity and severity than is present in the typical case."). In this case, a number of the alleged offending comments were not directed at Plaintiff specifically, but were allegedly said about Native American customers of the dealership.

7. In this case it is also particularly telling that it was Plaintiff himself who often initiated the joking regarding Native American customers with his use of the word "yahoo" to signal to the sales managers that he was bringing them a Native American customer. Several of Plaintiff's co-workers testified that it was Plaintiff that initiated the joking about Native American customers and that then the others would "chime in."

8. Another factor which the Court is required to consider in evaluating whether a Plaintiff meets the pervasiveness prong of the hostile environment test is whether the alleged conduct unreasonably interferes with the complaining party's work performance. In this case, there is no evidence that Plaintiff's work was affected by the alleged statements. In fact, Plaintiff's commission levels, which are linked directly to his

sales performance, steadily increased during the entire period of his employment with Pitre. Furthermore, when asked how he reacted to the alleged comments, Plaintiff stated, "I walked away" and the comments stopped. By Plaintiff's own admission, his ability to perform his job was not affected by the comments and joking. See Witt at 1433 (Plaintiff failed to demonstrate that harassment was subjectively severe as required by Title VII where employee testified about the effect of the allegedly harassing comment by stating "and I just kind of shrugged it off and walked away.")

9.   Moreover, it is clear that the statements were made in the give-and-take environment of a car dealership and were not made with racial animus. In fact, as set forth above, Plaintiff himself frequently participated in the off-color joking which sometimes included racial references. For example, Plaintiff said that white men had sex with cows, he made disparaging remarks about the size of the sex organs of white men, he referred to his supervisor Charles Ratliff as "white trash" and "old man" and he called supervisor Charles Fiorenza "wop" and "dago" to his face. Plaintiff also had a practice of making lewd drawings depicting his supervisors having sex with one another and various animals. This sort of mutual, albeit crude, joking is not racially motivated and fails to give rise to a hostile environment claim as a matter of law, particularly where the Plaintiff is so actively involved in the conduct. See Harris, 510 U.S. at 21-22. ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation".). See also Powell v. Missouri State Highway and Transportation Department, 822 F.2d 798 (8th Cir. 1987) (Plaintiff made racial slurs and referred to his fellow employees as "whitey" and

"honky." Instead of finding a hostile work environment based upon the existence of racial language, the court found that all of the employees were engaged in mutual "sporadic racial joking.").

10. Viewing the alleged incidents in this case under the totality of the circumstances, the Court finds Plaintiff has not stated a hostile work environment claim.

11. "In a case alleging hostile environment harassment, when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence… The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise". See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, at 41-42 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, at 59-60 (1998). The Tenth Circuit has recognized the applicability of Faragher and Ellerth in race discrimination cases. See Wright Simmons v. City of Oklahoma City, 155 F.3d 1264, 1271 (10th Cir. 1998).

12. A "tangible employment action" includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See Ellerth, 524 U.S. at 759; Faragher, 524 U.S. at 807-808. In this case, there has been no allegation of a tangible employment action in connection with the alleged

harassing behavior and so the Faragher and Ellerth affirmative defense is available to Pitre.[1]

13. An employer can satisfy the requirements of the affirmative defense by showing that it had disseminated an anti-harassment policy with a complaint procedure and that the plaintiff employee unreasonably failed to utilize the complaint procedure. See Ellerth at 42; Faragher at 60. To be an effective shield against liability, the employer's complaint procedure must provide for bypassing the offending supervisor in instances where the supervisor himself (or herself) is the alleged harasser. See Faragher at 61-62.

14. Pitre has proven by a preponderance of the evidence that it met the requirements of the Faragher and Ellerth affirmative defense in this case, thereby shielding it from liability. Specifically, although an anti-harassment policy was implemented and disseminated which provided Plaintiff a completely anonymous means of reporting harassment, Plaintiff failed to take advantage of it.

15. When Plaintiff did complain about the comments at the dealership, Pitre reacted immediately. On the very day that Plaintiff complained, Stever contacted AutoHR, Pitre's human resources consultant, and made arrangements to hold workshops for all employees and management of Pitre to review and reemphasize the company's anti-discrimination and anti-harassment policies. The seminars were held just days after Plaintiff's initial complaint and effectively stopped the offending behavior. Plaintiff made

---

[1] While Plaintiff initially raised a claim of retaliation, that claim was dismissed at summary judgment with Judge Parker finding, "It is undisputed that the Defendant suspended the Plaintiff because he made what is know as a 'straw purchase'". See Memorandum Opinion and Order [Doc. No. 22], p. 9. Several Employee Warning Reports to Plaintiff were likewise found to have been made for legitimate, non-discriminatory reasons. See id., pp. 7-8. Plaintiff has made no other allegations of tangible employment action in connection with this case.

no further complaints of continuing offending behavior, commending Pitre's management for the steps it had taken in correcting the situation.

16.     Having established the Faragher and Ellerth affirmative defense by a preponderance of the evidence, Pitre is not liable to the Plaintiff for damages.

17.     In light of the Court's Order for Partial Summary Judgment herein, Plaintiff's damages are limited in any event to those available under Title VII, specifically, back-pay, front pay, compensatory and punitive damages. See 42 U.S.C. § 2000 e-5(g). Compensatory and punitive damages have a combined cap of $50,000.00 under Title VII for employers, such as Pitre, who have from 15 to 100 employees. See 42 U.S.C. §1981a (b)(3)(A).

18.     Damages under the New Mexico Human Rights Act are limited to "actual damages and reasonable attorney's fees." NMSA 1978, § 28-1-13. The term "actual damages" is synonymous with compensatory damages, and excludes punitive damages. See Behrmann v. Phototron Corp., 110 N.M. 323, 795 P.2d 1015 (1990).

19.     Plaintiff voluntarily terminated his employment with Pitre on November 26, 1997, for reasons unrelated to his harassment claims, just ten (10) weeks after his initial report of harassment. See Boehms v. Crowell, 139 F.3d 452, 461-62, 76 FEP 13 68 (5th Cir. 1998), cert. denied, 119 S.Ct. 866 (1999) (award of back-pay cut off as of date of plaintiff's resignation).

20.     Plaintiff is likewise not entitled to back-pay or front pay inasmuch as after he quit his employment with Pitre voluntarily and was re-employed by another Albuquerque auto dealer, Quality, just one week later. See Hudson, Brocklehurst v. PPG

Indust., Inc., 865 F. Supp. 1253, 1266, 66 FEP 545 (E.D. Mich. 1994) (Front pay may be denied where Plaintiff obtains an equivalent position within a short period of time).

21. In any event, the duty to mitigate lost wages by taking reasonable measures to locate comparable substitute employment lies with Plaintiff. See Ford Motor Co. v. EEOC, 458 U.S. 219, 231, 29 FEP 121 (1982). In this case after being terminated from Quality, Plaintiff chose not to re-enter the workforce, opting instead to work on his art and jewelry making, as he had done for several years before coming to work at Pitre. See Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1468, 49 FEP 197 (5th Cir.) (Where the plaintiff (preferring self-employment) fails to pursue positions comparable to the one formerly held, the plaintiff's choice may curtail a back-pay award). When he finally did return to car sales in June of 2000, Plaintiff abandoned that job just four months later. See McIntosh v. Jones Truck Lines, Inc., 767 F.2d 433, 435, 38 FEP 710 (8th Cir. 1985) (a trucking company's back-pay liability ended when the claimant ceased looking for employment in the trucking industry).

22. The availability of noneconomic compensatory damages under Title VII does not mean their recovery is automatic whenever a plaintiff prevails. To qualify, a plaintiff must prove that he sustained noneconomic injuries, such as emotional distress, pain and suffering, harm to reputation, and other consequential injury, caused by defendant's unlawful conduct. See Carey v. Piphus, 435 U.S. 247, 266-67 (1978) (absent proof that the Plaintiffs suffered actual harm when the Defendant unlawfully suspended them, the Plaintiffs are entitled to only nominal damages).

23. Plaintiff is not entitled to compensatory damages inasmuch as he has not offered any evidence of the same. See Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 938-41, 72 FEP 613 (5th Cir. 1996), cert. denied 117 S. Ct. 767 (1997) (compensatory damages award set aside where there was no evidence of any specific discernable injury to claimants' emotional state and no corroborating testimony or medical or psychological evidence) and Brady v. Fort Bend County, 145 F.3d 691, 719 (5th Cir. 1998) (vague, conclusory, and uncorroborated testimony of emotional distress will not support award of compensatory damages).

24. Not having any basis for a compensatory or back-pay award, Plaintiff is not entitled to punitive damages under Title VII. See Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 14n. 10, 9 AD 242 (1st Cir. 1999) (must receive award of compensatory damages or back-pay as condition to punitives). Moreover, in order to recover punitive damages under Title VII, a plaintiff must prove that the employer discriminated "in the face of a perceived risk that its actions [would]…violate federal law to be liable in punitive damages." See Kolstad v. American Dental Ass'n., 527 U.S. 526, 119 S.Ct. 2118, 2125, 79 FEP 1697 (1999). Even upon such a showing, an employer may insulate itself from punitive damages where it can demonstrate "good-faith efforts" to comply with Title VII. See id. at 2129. In this case, Pitre has demonstrated such "good-faith efforts" in the implementation and dissemination of its anti-discrimination and anti-harassment policies and its prompt and remedial response upon receiving Plaintiff's first complaint of what he perceived as harassing behavior.[2]

---

[2] Punitive damages are not available under the New Mexico Human Rights Act. NMSA 1978, § 28-1-13.

25. Defendant is entitled to an award of costs in accordance with Section 706(k) of Title VII, and the Court finds that the Defendant is the prevailing party for this purpose. Counsel for the parties shall try to agree on the amount due under this paragraph, but if no agreement is made within ten (10) days after this judgment becomes final Defendant's counsel shall apply to this Court for an award no later than _____, 2001.

Respectfully submitted,

KELLY, RAMMELKAMP & MUEHLENWEG, P.A.
Attorneys at Law
A Professional Association

By: *[signature]*
David A. Rammelkamp
Shari L. Sterud
P.O. Box 25127
Albuquerque, NM 87125-5127
Telephone: (505) 247-8860
Attorneys for Pitre, Inc.

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served on the 11th day of May 2001 by hand-delivery and First Class Mail to:

Mark P. Geiger, Esq.
500 Marquette NW, Suite 600
Albuquerque, New Mexico 87102

*[signature]*
Shari L. Sterud